Lillian E. Johnston v. Commissioner. M. O. Johnston v. Commissioner.
Johnston v. Commissioner
Docket Nos. 2903, 2904.
United States Tax Court
1946 Tax Ct. Memo LEXIS 27; 5 T.C.M. (CCH) 1000; T.C.M. (RIA) 46277; November 29, 1946
William M. Farrer, Esq., and Walter K. Mitchell, Esq., 950 Western Pacific Bldg., Los Angeles 15, Calif., for the petitioners. E. A. Tonjes, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent has determined income tax deficiencies for the years 1940 and 1941 in the respective amounts of $848.90 and $24.95 against each petitioner. The questions presented are with respect to two deductions: (1) whether petitioner suffered a bad debt loss in 1940, and (2) whether an oil lease became worthless in 1941. The two cases were consolidated as the issues *28 in each case are the same. Findings of Fact Year 1940 M. O. Johnston and Lillian E. Johnston are husband and wife, and residents of Glendale, California. They filed their income tax returns for 1940 and 1941 with the Collector of Internal Revenue for the Sixth District of California. The returns are on the cash basis and the income of petitioners is divided pursuant to the community property laws of the State of California. As M. O. Johnston participated in the transactions involved herein, he will be referred to as petitioner. Petitioner is president of M. O. Johnston Oil Field Service Corporation and was interested in other businesses. One of the businesses was involved in a litigation of certain patent rights, which reached the United States Supreme Court, and because of the danger of receiving an adverse decision, he sought an interest in the Gas Lift Corporation of Dallas, Texas. This corporation's business was selling and servicing gas lift valves to lift oil from wells. The devices it handled were based on patent rights owned by Thomas E. Bryan, and the relationship between him and the corporation had become strained to the extent that Bryan was going to cancel his *29 contract with the corporation unless its management was changed. Petitioner had represented the Gas Lift Corporation as a selling agent in California. He knew Bryan and worked out an agreement between Bryan and the corporation, and also an agreement between himself and the shareholders of the corporation, which agreements were simultaneous, one dependent upon the other. On June 13, 1938, petitioner entered into an agreement with W. L. Pickens, individually and as trustee, J. F. Regent, R. R. Kyner and M. W. Story, the shareholders of the Gas Lift Corporation. The agreement recites that all parties are familiar with the condition of the Gas Lift Corporation, the number of shares owned by each shareholder, the indebtedness of $16,000 and $861, plus accrued interest, owing to two of the stockholders, and the negotiation of a license contract on behalf of the company by Johnston, in consideration for which services and other mutual promises and benefits, it was, in substance, agreed: 1. Fifty-one per cent of outstanding stock placed in escrow. 2. During term of agreement, all dividends and all money paid by second party (M. O. Johnston) to be paid to escrow agent and distributed *30 proportionately until a total agreed purchase price of $50,000 had been paid for the 51 per cent of the stock. 3. Corporate indebtedness to stockholders payable at $3,500 per month, beginning August 1, 1938. 4. Second party granted option to purchase 51 per cent of the stock for $50,000, payable at $3,500 per month, beginning after payment of stockholder debts but payment on debts or stock to be at least $3,500 each month, payable out of dividends on all outstanding stock if possible without depleting corporate assets, and second party shall have "the right, but he shall not be required, to advance additional money, either direct to the escrow agent or to the corporation, for the purpose of making said payments". 5. During term, second party to manage company without compensation and if necessary to provide additional working capital and in order to maintain the present financial status, he shall provide such additional working capital as an advance to the corporation. Advances refundable without interest "unless and except the same are forfeited as liquidated damages" in accordance with paragraph 9. 6. Second party to vote 51 per cent of stock. 7. Escrow fees $50 per month *31 payable one-half by second party. 8. Regarding officers and directors. 9. Contract and sale of 51 per cent of stock and turning of control of corporation to second party subject to condition precedent: (a) in event of failure to pay debts to stockholders as provided; (b) if debts are paid, but corporation and second party default in payment of any installment of $50,000; (c) on breach of any provision, agreement shall terminate at option of Pickens, the largest stockholder. In either of contingencies, second party shall forfeit all or such portion of advances as determined by arbitration. 10. Second party may terminate agreement at any time by giving 10 days' notice. 11. Disputes to be settled either prior to or within six months after termination by selected arbitrators. 12. Regarding disability of escrow agent. 13. Agreement binding on heirs, assigns, etc. Upon execution of the agreement, petitioner took over the management of the Gas Lift Corporation and directed the policies pursuant to paragraph 5 of the agreement. The corporation was unable to make all the payments called for under the contract, as they became due, without depleting the surplus of the *32 corporation to an extent provided by the contract, and in order to protect his rights and to avoid a default of the contract, petitioner made certain cash advances to the corporation in order to enable it to make the required payments. One of the purposes of the contract was to enable petitioner to acquire 51 per cent of the stock of the corporation, and the cash advances he made were made to protect his rights to acquire the capital stock of the corporation. Petitioner made four advances of $3,500 each to the corporation on the following dates: September 28, 1938, October 29, 1938, December 27, 1938, and January 30, 1939. These advances were all made under the provisions of the agreement and there was no other arrangement for repayment, no evidence of indebtedness given by the corporation and no provision for payment of any interest. There was no selection of a board of arbitrators to determine any liquidated damages against petitioner in which manner the advances made by petitioner could be forfeited under the agreement. The advances were charged on petitioner's books of account in the accounts receivable section to "Gas Lift Corporation, Houston, Texas", and were entered in the *33 books of account of the Gas Lift Corporation to an account entitled "Advanced by M. O. Johnston". The advances were made from community funds. Petitioner terminated the agreement on or about February 15, 1939, by notice to the escrow agent, as provided under the provisions of paragraph 10 of the agreement. He was unable to collect from the corporation the aggregate amount of $14,000 which he had advanced. On December 29, 1939, he filed suit in the Federal Court for the Southern District of Texas for the recovery of the $14,000. Counterclaims were filed against petitioner. A settlement was reached out of court whereby petitioner received $500 from the corporation. The financial condition of the Gas Lift Corporation made it impossible for petitioner to recover more than the $500. Upon the payment of the $500, the proceeding was dismissed on November 23, 1940. Petitioners each claimed one-half of the remaining $13,500, or $6,750 each, as a bad debt on their respective income tax returns for the year 1940. Respondent disallowed the bad debt claimed in the return by petitioners and made the following explanation of adjustment: On your return for 1940 you deducted $7,045.00 as your *34 community one-half of bad debts amounting to a total of $14,090.00 and including a loss on an account of $13,500.00 allegedly due from the Gas Lift Corporation. It is determined that this loss of $13,500.00 was attributable to failure to exercise a privilege or option to buy capital stock of Gas Lift Corporation and under the provisions of Section 117 (g)(2) of the Internal Revenue Code, the loss is considered to be a short-term capital loss. Section 117(d) of the Internal Revenue Code as applicable to the year 1940 provides that shortterm capital losses shall be allowed only to the extent of short-term capital gains and inasmuch as no short-term capital gains were reported by you for the year 1940 it is held that the loss of $6,750.00 sustained on the Gas Lift Corporation transaction is not deductible in computing net income. Each petitioner now claims that a bad debt in the amount of $4,359.78 resulted from the transaction, which amount is determined as follows: Total amount advanced by Mr. Johns-on
ton to Gas Lift Corporation
$14,000.00
Amount used by that corporation to
make payments to its stockholders
under the aforesaid agreement
4,780.43
Balance
$ 9,219.57
Amount received by Mr. Johnston in
compromise
500.00
Amount lost by Mr. Johnston for a
bad debt and/or in the settlement
of a law suit for damages for the
mismanagement of the affairs of Gas
Lift Corporation
$ 8,719.57
The said $14,000.00 was community
property funds of petitioner and his
wife, Lillian E. Johnston, and each
suffered a loss of one-half of
$8,719.57, or
$ 4,359.78
*35 The respondent adheres to the position taken in the notice of deficiency. Year 1941 On September 27, 1939, petitioner purchased an oil and gas interest in property located in Lea County, New Mexico. The purchase was made under an oil and gas prospecting permit No. 030074, issued by the United States Department of the Interior to C. W. Webster and by mesne assignments assigned to George F. Seideman, from whom petitioner purchased his interest. The purchase price of the interest was $201.43 and the purchase was made from the community property funds of petitioners. On June 9, 1941, the permit was cancelled by the United States Department of the Interior. Neither of the petitioners received anything of value from the purchase and each petitioner's share in the cost of and loss in the oil and gas interest was $100.72, which loss occurred in 1941. Opinion ARUNDELL, Judge: Respondent has not pressed the issue relative to the loss on the oil and gas prospecting permit, in the light of the testimony presented by petitioner. The evidence fully supports petitioner's claim for a loss deduction in 1941. There remains the issue as to whether petitioner is entitled to a bad debt deduction *36 in 1940. The determination of this issue depends upon the proper interpretation of the written agreement executed by petitioner and the shareholders of the Gas Lift Corporation. If respondent's interpretation is accepted, then the contract between the parties is only a stock purchase agreement, and petitioner, having failed to complete the purchase of the stock, cannot claim a bad debt deduction for payments he has forfeited. But to give the agreement that construction is to look only at the "option to purchase" clause and ignore other parts of the contract. While it may be properly said that one of the main purposes of the agreement was for petitioner to obtain 51 per cent of the stock of the corporation, yet it is apparent that the parties had other intention no less important, one of which was to keep the corporation a "going concern". If Bryan, the patent owner, had cancelled his contract with the corporation as he was threatening to do unless the management was changed, the corporation would have suffered a big loss, if not the loss of its entire business. Through petitioner's efforts a new contract was entered into between the corporation and Bryan, the latter being willing *37 to so contract because of petitioner's agreement with the shareholders. It was no doubt thought that under petitioner's management the corporation would make money, and in consideration of that the stockholders were willing to sell petitioner 51 per cent of their stock. It is clear that all parties to the agreement intended that the corporation should first pay its operating expenses and then its indebtedness to the two shareholders, before petitioner should start making his installment payments on the purchase price of the stock. If the corporaton had failed to meet its obligations, then the agreement was terminated unless petitioner had exercised his privilege to advance money to the corporation. In making such advances, he thereby kept the contract in operation and protected his right to purchase the stock at a later date. He was not required to make the advances, and if and when he did, it was provided that the sums so loaned would be repaid. The corporation's outstanding indebtedness, somewhat reduced, was shifted from the stockholder-creditors to petitioner. If those creditors could collect on their debt (and there is nothing to show to the contrary), then in the light of the *38 contract, petitioner was entitled to collect on his indebtedness. There is no controversy between petitioner, the corporation, or its stockholders as to the indebtedness or as to the interpretation of the contract. The fact that there had been litigation and then a settlement, whereby petitioner collected $500 from the corporation, is evidence that an indebtedness was recognized and that the parties construed the contract alike. They expressed their intentions in the contract and their subsequent actions conformed to those intentions. We think the parties' interpretation of the contract should be followed, especially since the terms of the agreement clearly support their interpretation. The full force and effect of all the provisions of the contract is that the parties intended that petitioner could purchase the stock after the corporation's indebtedness had been paid, and that during that period if petitioner deemed it necessary to make advances to the corporation and did so in order for it to meet its obligations, he was entitled to be repaid. Since the advances were made from community funds, each petitioner is therefore entitled to the deduction of $4,359.78, as a bad debt, suffered *39 in 1940, under Section 23(k)(1) of the Internal Revenue Code, and Regulations 111, Section 29.23(k)(1). Decisions will be entered under Rule 50.